**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 18-4875

UNITED STATES OF AMERICA,

       Plaintiff – Appellant,

   v.

ANTONIO SIMMONS, a/k/a Murdock, Doc,

       Defendant – Appellee.

### No. 18-4876

UNITED STATES OF AMERICA,

       Plaintiff – Appellant,

   v.

NATHANIEL TYREE MITCHELL, a/k/a Savage,

       Defendant – Appellee.

### No. 18-4877

UNITED STATES OF AMERICA,

       Plaintiff – Appellant,

   v.

MALEK LASSITER, a/k/a Leeko,

Defendant – Appellee.

_____

**No. 19-4269**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

NATHANIEL TYREE MITCHELL, a/k/a Savage,

Defendant – Appellant.

_____

**No. 19-4287**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MALEK LASSITER, a/k/a Leeko,

Defendant – Appellant.

_____

**No. 19-4345**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ANTONIO SIMMONS, a/k/a Murdock, a/k/a Doc,

2

Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Mark S. Davis, District Judge. (2:16-cr-00130-MSD-LRL-1)

_____

Argued: October 30, 2020                                    Decided: May 28, 2021

Amended: August 23, 2021

_____

Before AGEE, WYNN, and RICHARDSON, Circuit Judges.

_____

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Wynn joined. Judge Richardson wrote an opinion concurring in part and concurring in the judgment.

_____

**ARGUED:** Teresa Ann Wallbaum, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant/Cross-Appellee. Paul Graham Beers, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia; Laura Pellatiro Tayman, LAURA P. TAYMAN, PLLC, Newport News, Virginia, for Appellees/Cross-Appellant. **ON BRIEF:** Brian A. Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; G. Zachary Terwilliger, United States Attorney, Daniel T. Young, Assistant United States Attorney, Alexandria, Virginia, Andrew Bosse, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia for Appellant/Cross-Appellee. Maureen Leigh White, Richmond, Virginia, for Appellee/Cross-Appellant Nathaniel Mitchell.

_____

AGEE, Circuit Judge:

Antonio Simmons, Nathaniel Mitchell, and Malek Lassiter (collectively, "Defendants") were charged in a thirty-eight count Second Superseding Indictment ("SSI"). They were alleged to be members of a Hampton Roads, Virginia line of the Nine Trey Gangsters ("Nine Trey"), an east coast set of the United Blood Nation.

The SSI alleged that Defendants, along with Anthony Foye and Alvaughn Davis,[1] conspired to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); committed multiple violations of the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959; and committed multiple violations of 18 U.S.C. § 924(c), for using, brandishing, and/or possessing a firearm during the commission of a crime of violence. After a seven-week jury trial that commenced on February 6, 2018, a jury convicted Defendants of thirty-seven counts charged in the SSI.[2] One of those offenses, Count 30, alleged a violation of 18 U.S.C. § 924(c), with the predicate "crime of violence" being what the Government characterizes as an "aggravated" form of a RICO conspiracy, the charge alleged in Count One. After trial, Defendants moved to set aside the verdict as to Count 30 and the district court granted that motion.

---

[1] Foye and Davis were also co-defendants in the original Indictment, but they pleaded guilty prior to Defendants' trial. Davis cooperated with the Government and testified in its case-in-chief against Defendants.

[2] Prior to submitting the case to the jury, the district court granted Simmons' motion for judgment of acquittal as to Count 38, a witness tampering charge levied solely against him. J.A. 5160–61.

Ultimately, Simmons received three consecutive life sentences, plus a fourth consecutive sentence of forty years' imprisonment; Mitchell received five consecutive life sentences, plus a sixth consecutive sentence of fifty years' imprisonment; and Lassiter received thirty-five years' imprisonment. The Government appeals the decision to set aside the verdict as to Count 30. Defendants have cross-appealed, challenging two of the district court's evidentiary rulings at trial, three of its jury instructions, and the sufficiency of the evidence underlying a host of their convictions.

As explained below, we agree with the district court that a RICO conspiracy, even when denominated as "aggravated," does not categorically qualify as a "crime of violence." As to Defendants' cross-appeals, we find merit in two of their contentions. Specifically, we first hold that the district court constructively amended Counts 8, 15, 18, 27, and 29 by instructing the jury on the elements of a state law predicate offense not alleged in the SSI. Second, we hold that the evidence was insufficient to support their convictions on one of the VICAR attempted murder offenses, which also requires reversing their convictions for the related § 924(c) offense. Accordingly, the district court's judgment as to each Defendant is affirmed in part, reversed in part, and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

I.

A.

Founded in 1993, Nine Trey was the "first of [the] original Eastside set[s]" of the Bloods. J.A. 1856, 3998. Nine Trey required its members to act within their "line," or chain

5

of command, establishing a hierarchy akin to the military. A new member could join Nine Trey by either getting "beat into" the gang—i.e., getting jumped by members—or by "putting in work"—e.g., selling drugs, committing acts of violence, or otherwise earning money for the gang. J.A. 1629–30, 4003–04. Members generally moved up in rank based on their reputation for violence, their loyalty to the gang, and their ability to recruit new members and make money. Robberies and drug trafficking were two of the most common sources of funds for Nine Trey.

Adhering to the line's chain of command was "[v]ery important" to Nine Trey, and transgressors could be disciplined for failing to do so. J.A. 1684–85. Punishments ranged in severity based on the offense. Certain offenses—like snitching—called for the "death penalty." J.A. 1640–41. The "death penalty" for snitching applied even if the transgressor was not a Nine Trey member.

Respect was another important Nine Trey tenet. If a Nine Trey member was ever disrespected by another Nine Trey member, a rival gang member, or someone from the general public, he was expected to "handle" it, as disrespect to one Nine Trey member was viewed as disrespect to the entire gang. J.A. 1675, 1894–95. Any showing of disrespect could have been a "death sentence." J.A. 1896. If the member could not get to the person that disrespected him, he would go after "the closest one to 'em.," i.e., their "[m]other, wife, child, sister, aunt, brother." J.A. 1635.

In November and December 2015, Simmons, Mitchell, Foye, and Davis were well-established members of a Hampton Roads-based line of Nine Trey. Simmons held the rank of "Low," an upper-level management position in Nine Trey, "managing the daily or

6

monthly activities" of his subordinates. J.A. 1862–63, 2973, 6077.[3] In addition to his managerial duties, Simmons engaged in narcotics trafficking. Foye was a "Three-Star General" in Simmons' line, who looked up to Simmons as a father figure. J.A. 2978, 6079–80. Davis was also a "Three-Star General" who associated with Simmons' line during those two months, and Mitchell was a "One-Star General" in Simmons' line. By December 2015, based on their propensity for violence, Simmons had designated Foye, Mitchell, and Davis as his "cleanup crew," or his chosen squad of "shooters." J.A. 4066–67. Lassiter, Foye's cousin, had not officially become a Nine Trey member by the beginning of December 2015, but he was looking to join the gang.

B.

Between December 10 and December 27, 2015, Defendants (along with Foye and Davis) committed a spree of robberies, murders, and attempted murders in the Hampton Roads and Virginia Beach area that left six people dead and three more wounded. The Government pointed to two catalysts that sparked this crime spree.

In the fall of 2015, Simmons received a disciplinary action from his Nine Trey superior, "Dido." Simmons and Dido had attempted to smuggle marijuana into a state jail. The deal went awry, however, and Dido lost all of his investment for which he held Simmons personally responsible. Dido disciplined Simmons for this debt by putting him

---

[3] Simmons asserted at trial, and continues to assert on appeal, that he was stripped of his rank in May 2015. Several witnesses contradicted Simmons' claim, testifying that he was a "Low" in December 2015. *See* J.A. 2973–74, 2976–77, 3587–88. We decline to revisit this factual issue, for the resolution of the contradictory evidence is left to the jury. *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997).

"on freeze." For Nine Trey purposes, anyone put "on freeze" was to focus solely on "rectify[ing] whatever reason you got put on freeze." J.A. 4055. Thus, Simmons' desire to repay Dido and maintain good standing in Nine Trey motivated him to call on his "cleanup crew"—Foye, Mitchell, and Davis—to help him get the cash to pay his debt.

At that same time, Mitchell was looking to increase his notoriety within the gang in order to rise in its ranks. Mitchell knew that do so, he had to "put in work." By December 2015, Foye had a well-known reputation for violence. In fact, Foye was known for "going around . . . shooting people for nothing and . . . killing people." J.A. 4155. Mitchell wanted to prove that he was "just as much of a gangster as [Foye]." *Id.*

### 1.

By late November 2015, Foye had growing concerns that one of his childhood friends and fellow Nine Trey members, Al-Tariq Tynes, had become a snitch. Foye began texting multiple individuals discussing harming and robbing Tynes both because he was a snitch and because Tynes was rumored to have money.

On December 10, 2015, at 7:28 p.m.—with Simmons still on "freeze"— Foye was hanging out alone with Tynes. Foye texted Davis, "Don't call me, but I need you on deck, bro." J.A. 4080. Foye then texted Simmons four minutes later, saying, "20 minutes ima kall u dad." J.A. 5956. One minute later, at 7:34 p.m., Foye followed up with Simmons, "Im with the meal so its guarenteed." J.A. 5956.[4] In Nine Trey's coded language, food

---

[4] Our recitation of Defendants' text messages will not alter grammatical, spelling, or syntax errors unless necessary for clarity's sake. Curse words have been redacted in this opinion, but are unredacted in the original texts.

references like "the meal" or "being on the plate" signified that someone was a target for violence. *E.g.*, J.A. 1888–90. Simmons replied, "Faxtz," which signaled confirmation. J.A. 1727, 5956.

Shortly thereafter, Foye called Davis for help. J.A. 4081. When Davis arrived, he saw Foye in Tynes' gold Lexus, with Tynes dead in the passenger seat. Foye told Davis that he shot Tynes in the head. Just hours later, at 2:56 a.m., Simmons texted Foye, "Bro I've been up all night i need the money by 11 this morning smh or we dead bro." J.A. 5957. In a subsequent post-arrest interview with law enforcement, Simmons admitted that the money he referenced was to be used to repay Dido and get relief from the "freeze."

2.

On December 14, 2015, Simmons, who was still in need of money to pay Dido, instructed Davis, Foye, and Mitchell on a plan to rob a gambling spot in Norfolk, Virginia. The four initially planned to go to the gambling house sometime after 7:00 p.m., but that plan did not materialize. Eventually, at 8:58 p.m., Foye texted Simmons, "man we only have two hours. if you dont hurry up ima get out and redrum somebody." J.A. 5968. "Redrum," another Nine Trey code word, is "murder" spelled backwards. J.A. 4530.

Ultimately, the gambling house robbery never occurred. By 1:00 a.m., Foye and Mitchell were passengers in Davis' car, and Foye directed Davis to Portsmouth, Virginia. At 1:57 a.m., Foye texted Simmons, "redrum if u kam pour me a shot of sum but ima . . . talk to u [tomorrow]." J.A. 5969. Simmons replied, "Handle that before 7:00 5." *Id.* "5" is one of the monikers Nine Trey members called each other. J.A. 4563. Simmons then immediately followed up, "[T]hat gambling spot still a go 5 f**k what Dognutz talking

9

about 5[.]" J.A. 5969.[5] Foye confirmed at 2:16 a.m., *id.*, and then told Davis to stop the car. Foye and Mitchell jumped out, and began firing at two people walking along the street, R.F. and Vandalet Mercer. Mercer was shot dead, but R.F. was only shot in the hand. After the shooting, Foye said to Mitchell, "man, bro, you shot that bit*h." J.A. 4122. R.F. placed a 911 call at 2:20 a.m. At that same time, 2:20 a.m., Foye placed a forty-seven second phone call to Simmons.

3.

Three more murders occurred on December 20 and 21, 2015. Just after midnight on December 20, 2015, Foye and Mitchell shot to death Linda Lassiter ("Linda") and Wayne Davis ("Wayne")[6] in Portsmouth, because Foye heard that someone related to Linda was telling police that he was involved in shooting up her house on Thanksgiving that year. And on December 21, Mitchell shot and killed Jamesha Roberts in Norfolk, Virginia, simply because she was walking on the same side of the street as him. Mitchell boasted to his fellow Nine Trey members about the shooting, saying that "the bi**h shouldn't have been walking on my side of the street." J.A. 4155. In fact, Brehon was present when Mitchell told Foye after he shot Roberts, "[F]**k that bi**h, man, but you still one up on me, bro," which Brehon took to mean that Mitchell and Foye were competing with each other for the most shootings. J.A. 3013, 3045–46.

---

[5] "Dognutz" was Donte Brehon, another Nine Trey member who told Simmons that that gambling spot was off limits because one of Brehon's "uncles" ran it.

[6] Neither victim bore any relation to Defendants.

10

4.

By December 27, 2015, word of Simmons' "freeze" had reached a rival Nine Trey "Low" named "Skino," who led a Nine Trey line based in Virginia Beach. At that time, Simmons and Skino were in an intra-gang dispute because Simmons allowed one of Skino's men to "jump" from Skino's line to Simmons' line. Line-jumping often caused such rivalries within Nine Trey because it was seen as a sign of disrespect to their former superior. Thus, while Simmons' "freeze" was supposed to stay secret, Skino decided to make it public knowledge to get back at Simmons. In response, Simmons decided to take over Skino's line by whatever means necessary.

On December 27, 2015, Mitchell, Foye, Lassiter, and Davis went to a meeting at Simmons' house. Lassiter was wearing a red bandana, which is a common apparel item for Nine Trey members. Because Lassiter was not yet a Nine Trey member, Davis questioned Foye about it. Foye then handed Lassiter a .38 caliber handgun and told Davis that Lassiter was "about to make his way home." J.A. 4151. Someone "making their way home" was gang code for their becoming a member of Nine Trey by "putting in work." J.A. 4004. Simmons also questioned why Lassiter was there and wearing red. Foye again said that Lassiter was "about to make his way home." J.A. 4152–53.

During the meeting, the men discussed Simmons' dispute with Skino, and Simmons remarked, "yo, can't none of [Skino's] scraps bang out here no more." J.A. 4153. Simmons instructed that Blacko and Lanez, two of Skino's Generals, "got a vest on," because to his knowledge, they were going to "jump lines" and fall under Simmons. J.A. 4153–54. Simmons then directed, "[A]nybody else they a green light on them. If they ain't trying to

11

flip, if they ain't trying to flip, mash the gas on them." J.A. 4153. Under Nine Trey's coded language, being "vested" means you are "bulletproof." J.A. 4154. "Mash[ing] the gas," on the other hand, means to kill, J.A. 1660, or "go hard at" someone, J.A. 2969.

The four men left together in one car, first heading to the apartment where Nino, another of Skino's Generals, lived. Mitchell, Foye, and Lassiter got out of the car with loaded guns, and knocked on Nino's door. Davis estimated that the men waited by the door for less than ten minutes. After getting no answer, they left. Shortly thereafter, Nino called Mitchell and remarked, "[B]ro, I just saw you all leave my house, like what you all got going on?" J.A. 4158. Mitchell responded that they were "just coming to check you out." J.A. 4158–59. Nino replied that he had heard from Blacko that "[Simmons] be pushing the button on us" for "fall back from you all." J.A. 4159. Blacko had also told Nino that Skino wanted his men to "get [their] guns up" in preparation. *Id.* Mitchell then tried to "soothe" Nino, saying, "you know, Blacko supposed to be falling up under [Simmons], we were trying to see if you all were trying to make the same move." *Id.* Once Mitchell ended the call, Foye said, "[M]an, f**k that vest, f**k Blacko and that vest." J.A. 4160.

The men then drove to a Virginia Beach neighborhood where Mitchell believed that Lanez lived. Davis believed that if they found Lanez, "they was gonna kill him. More than likely." J.A. 4162. When they got to Lanez' house, it "looked[] like it was empty." J.A. 4162. Mitchell "didn't want to go up and knock on the door, so [the men] pulled around" back, where he then saw people who he recognized as knowing Lanez. *Id.* He got out of the car and asked them if they had seen Lanez, but they had not. They then drove back to Portsmouth.

12

5.

Proceeding down the list of Skino's Generals, Foye next called Blacko on their drive back to Portsmouth. Foye pretended to have an interest in purchasing guns from Blacko, in an effort to figure out where he lived. Blacko told Foye that he was living in Norfolk. Nonetheless, Foye directed Davis through Portsmouth to a house that Foye believed to be Blacko's residence. When they arrived at the house, they could see someone was there. Foye said, "yo, I know that ni**a was lying." J.A. 4165. Davis pulled up past the house, and "parked like further down the street almost around the curve." *Id.* Mitchell, Lassiter, and Foye got out of the car, and walked towards the house. Mitchell and Foye approached the door, while Lassiter stood watch just down the street.

That house actually belonged to S.M., a woman who had dated Blacko in high school and had remained friends with him. At around 8:45 p.m., Mitchell and Foye knocked on her door and S.M., who was home alone at the time, could see a third man about twenty to twenty-five feet down the street, facing away from her house. Just minutes later, Mitchell shot her six times at point-blank range in the doorway. As Mitchell and Foye began to run back to the car, Foye and Lassiter fired four to five shots at neighbors who were gathered outside their homes and had witnessed the shooting.

After hearing of the shooting, Simmons called Davis "screaming at the top of his lungs," telling Davis that Blacko and Skino were looking for Davis. J.A. 4171–72. Davis testified that, in his view, Simmons was "[n]ot necessarily" upset that S.M. had been shot, but more so at "how everything came back on him." J.A. 4173–74.

13

II.

Based on Defendants' December 2015 conduct, the SSI alleged three primary categories of offenses. First, Count One alleged that Defendants conspired to violate the RICO statute, 18 U.S.C. § 1962(d). Following Count One was a separate "Notice of Special Sentencing Factors," which alleged that Simmons murdered Tynes and Mercer, and that Mitchell murdered Mercer, Roberts, Wayne, and Linda, in violation of section 18.2-32 of the Virginia Code.

Second, the SSI alleged a host of VICAR offenses stemming from Defendants' murders and attempted murders. For each attempted murder, the SSI alleged that Simmons, Mitchell, and/or Lassiter committed both "Attempted Murder in Aid of Racketeering Activity" and "Assault with a Dangerous Weapon in Aid of Racketeering Activity." These assault with a dangerous weapon counts, Counts 8, 15, 18, 27, and 29 ("the VICAR Assault Counts") were based on two state predicate offenses: violations of Va. Code Ann. §§ 18.2-53.1 and 18.2-282.

Finally, for each murder and attempted murder victim, the SSI alleged a related charge under 18 U.S.C. § 924(c) for using, brandishing, and/or possessing a firearm during a crime of violence. For each § 924(c) count, the predicate "crimes of violence" were: (1) the "aggravated" RICO conspiracy alleged in Count One, and (2) the VICAR count(s) associated with that victim. Of particular relevance here is Count 30, which alleged that Defendants knowingly possessed, brandished, and discharged a firearm during two crimes of violence: the "aggravated" RICO conspiracy alleged in Count One and the VICAR Assault offense set forth in Count 29, which alleged that Defendants assaulted S.M.'s

14

unidentified neighbors. Defendants never moved to dismiss any count for failure to state an offense under Federal Rule of Criminal Procedure 12(b).

The jury convicted Defendants of all thirty-seven counts submitted to them, and found each of the RICO conspiracy "Special Sentencing Factors" alleged as to Simmons and Mitchell. After trial, Defendants moved to set aside the verdict pursuant to Federal Rules of Criminal Procedure 29(c) and 33. They argued for the first time that under *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), decided during Defendants' trial, each 18 U.S.C. § 924(c) count (including Count 30) was invalid, because none of the predicate offenses was categorically a crime of violence. After briefing on these motions, the trial court *sua sponte* asked the parties to brief a separate issue regarding the legal sufficiency of one of the state law predicates alleged in support of the VICAR Assault Counts: "[D]oes a violation of [Va. Code Ann.] § 18.2-282 reach conduct that does not correspond in substantial part to the generic crime of 'assault with a deadly weapon'?" Order at 2, *United States v. Simmons*, No. 2:16-cr-130 (E.D. Va. filed Oct. 19, 2018), ECF 496.

On November 16, 2018, the district court granted Defendants' motion to set aside the verdict as to Count 30, and denied the balance of their claims. First, as to the issue the court raised *sua sponte*, it found that Defendants waived any claim of error as to whether § 18.2-282 supported the VICAR Assault Counts, because that argument should have been raised in a Rule 12(b)(3) motion to dismiss. *United States v. Simmons*, No. 2:16-cr-130, 2018 WL 6012368, at *3–4 (E.D. Va. Nov. 16, 2018). Second, the court concluded that Defendants' convictions on Count 30 should be vacated because neither the "aggravated"

15

RICO conspiracy in Count One nor the VICAR Assault offense in Count 29 was a "crime of violence." *Id.* at *4–10.

The Government timely appealed the district court's ruling to set aside the verdict as to Count 30. Defendants timely cross-appealed their convictions. We have jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

III.

We begin with the Government's appeal of the district court's ruling to set aside the verdict as to the 18 U.S.C. § 924(c) offense alleged in Count 30. As noted, the district court held that both the "aggravated" RICO conspiracy in Count One and the VICAR Assault offense in Count 29 were not crimes of violence. The Government expressly limits its appeal on Count 30 "to the argument that a RICO conspiracy with aggravating factors qualifies as a crime of violence when those aggravating factors are themselves crimes of violence." Opening Br. 32 n.12. We review this question *de novo*. *United States v. Mathis*, 932 F.3d 242, 263 (4th Cir. 2019).

A.

Pursuant to 18 U.S.C. § 924(c)(1)(A), it is a crime to use, carry, or possess a firearm "during and in relation to any crime of violence." Section 924(c)(3) sets forth two definitions of "crime of violence." The only one that remains valid, § 924(c)(3)(A) ("the force clause"), defines a "crime of violence" as any crime that "has as an element the use, attempted use, or threatened use of physical force against the person or property of

16

another."[7] To determine whether an offense is such a "crime of violence," we continue to be confined to apply the "categorical approach" or, in a "narrow range of cases," the "modified categorical approach." *Mathis*, 932 F.3d at 264 (quoting *Descamps v. United States*, 570 U.S. 254, 261–62 (2013)).

The categorical approach applies to "indivisible" statutes, those that set out a single set of elements defining the crime. *United States v. Bryant*, 949 F.3d 168, 172 (4th Cir. 2020). It asks whether the elements of the offense "necessarily require the use, attempted use, or threatened use of force." *Id.* (citations omitted).

The "modified categorical approach" applies to "divisible" statutes, those that list "potential offense elements in the alternative," and thus include "multiple, alternative versions of the crime." *Id.* at 173 (quoting *Descamps*, 570 U.S. at 257). Because of the statute's divisibility, it is not possible to determine by reference to the statute alone if the defendant was convicted of a crime of violence. *United States v. Cabrera-Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013); *see also Descamps*, 570 U.S. at 260. Accordingly, the modified categorical approach allows us to look to certain documents like the indictment and jury instructions ("*Shepard* documents")[8] solely to determine "which of the statute's alternative elements formed the basis" of the defendant's conviction. *Bryant*, 949 F.3d at

---

[7] Section 924(c)(3)(B), the "residual clause," has been invalidated as unconstitutionally vague. *United States v. Davis*, 139 S. Ct. 2319, 2326–32 (2019).

[8] 544 U.S. 13 (2005).

173 (citation omitted). From there, we apply the categorical approach analysis to that offense to determine whether it is a crime of violence. *Id.*

In *Mathis v. United States*, the Supreme Court clarified that to determine whether an "alternatively phrased statute" is indivisible (thus permitting only use of the categorical approach) or divisible (requiring use of the modified categorical approach), we must determine whether the alternative statutory factors are "means" or "elements." 136 S. Ct. 2243, 2256 (2016); *see Ham v. Breckon*, 994 F.3d 682, 688–89 (4th Cir. 2021). Statutory factors are "means," and do not create a divisible statute, if they are merely "'alternative methods' of committing one offense." *Mathis*, 136 S. Ct. at 2256. (citation and alteration omitted). Statutory factors are elements, and thereby create a divisible statute, if their presence increases the statutory maximum punishment. *Id.*

### B.

### 1.

To determine whether Mitchell's and Simmons' RICO conspiracy convictions were crimes of violence, we must first consult the text of the RICO statute to determine whether a RICO conspiracy is a divisible or indivisible crime of conviction. In its entirety, § 1962(d) reads: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."[9] We have said that there are only three essential

---

[9] Generally, § 1962(a) to (c) make it unlawful to engage in a pattern of racketeering activity through an enterprise that is engaged in, or affects, interstate or foreign commerce; and to use proceeds from such activity to acquire control of, or establish, some other entity that affects interstate or foreign commerce.

elements in any § 1962(d) prosecution: (1) "that an enterprise affecting interstate commerce existed"; (2) "that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise" and (3) "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering [activities]." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (citations and internal quotation marks omitted). "[R]acketeering activity" includes "any act or threat involving murder" or a host of other state law offenses "which is chargeable under State law and punishable by imprisonment for more than one year," as well as myriad enumerated federal criminal offenses. 18 U.S.C. § 1961(1).

The foregoing elements follow from the Supreme Court's directive in *Salinas v. United States* that a defendant can complete the requisite § 1962(d) conspiracy without ever "commit[ting] or agree[ing] to commit the two or more" racketeering acts that are otherwise necessary to complete a substantive violation of the RICO statute. 522 U.S. 52, 65–66 (1997). The Court explained:

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion.

*Id.* at 65. In fact, the Court explicitly recognized that a § 1962(d) conspiracy exists even if no co-conspirator completes *any* of the agreed-upon racketeering acts. *Id.* at 63.

In the ordinary case, a defendant who "violates any provision of section 1962" may receive a sentence of up to twenty years' imprisonment. 18 U.S.C. § 1963(a). However, if a violation of the RICO statute is "based on a racketeering activity for which the maximum

19

penalty includes life imprisonment," then the maximum penalty for the RICO offense increases to life imprisonment. *Id.* For example, a violation of 21 U.S.C. § 841 for manufacturing, distributing, or dispensing controlled substances, if certain drug quantity thresholds are met, is a racketeering act that carries a penalty of up to life imprisonment. *See* 18 U.S.C. § 1961(1)(D); 21 U.S.C. § 841(a)(1), (b)(1)(A).

The Government argues that because § 1963(a) provides a factor that increases the statutory maximum punishment for a RICO conspiracy, the RICO conspiracy statute is divisible into two kinds of conspiracies: ones in which the § 1963(a) sentencing enhancement does not apply, and ones in which it does—the latter of which the Government refers to as "aggravated" RICO conspiracies. So, the Government insists, we must apply the modified categorical approach.

Mitchell and Simmons counter that the RICO conspiracy statute is indivisible because there is only one substantive RICO conspiracy offense. They assert that there is "no authority for [the Government's] argument that the special sentencing factors enumerated after Count One convert the charged RICO conspiracy into [a] new crime which is an aggravated form of the offense." Cross-Opening Br. 89. According to Mitchell and Simmons, the Special Sentencing Factors are merely "factors affecting the sentence rather than elements of the offense." *Id.*

There is some force to both arguments. For the Government's part, there is case law that seems to indicate that the inclusion of any statutory factor increasing the maximum punishment in effect creates "aggravated" forms of that crime. In *Jones v. United States*, for example, the Supreme Court held that 18 U.S.C. § 2119(2) and (3), which set forth

20

increasing statutory maximum punishments for carjacking based on whether "serious bodily injury" or "death" result, both are "aggravated" forms of carjacking. 526 U.S. 227, 233–36 (1999). Just one year later, in *Apprendi v. New Jersey*, the Court went further, explaining that at the time of our country's founding the Framers did not distinguish between "an 'element' of a felony offense and a 'sentencing factor.'" 530 U.S. 466, 478 (2000). Instead, in the Framers' eyes, "facts that expose[d] a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Id.* at 483 n.10. Since *Apprendi*, both the Supreme Court and this Court have said, in certain circumstances, that when Congress enumerates facts that increase the statutory maximum penalty, it has effectively created "aggravated" forms of that crime. *See, e.g.*, *Ring v. Arizona*, 536 U.S. 584, 605 (2002) ("[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." (quoting *Apprendi*, 530 U.S. at 494 n.19)); *United States v. Promise*, 255 F.3d 150, 156 (4th Cir. 2001) (en banc) ("*Apprendi* dictates in order to authorize the imposition of a sentence exceeding the maximum allowable without a jury finding of a specific threshold drug quantity [under 21 U.S.C. § 841], the specific threshold quantity must be treated as an element of an aggravated drug trafficking offense[.]"). Indeed, *Mathis* cited *Apprendi* for the notion that statutory factors carry differing punishments "must be elements." *Mathis*, 136 S. Ct. at 2256 (citing *Apprendi*, 530 U.S. at 490).

Under the Government's logic, then, the completion of some racketeering activity carrying a maximum penalty of life imprisonment under state law, *see* 18 U.S.C. § 1963(a), would be an "element" rendering § 1962(d) divisible. Thus, for purposes of the "crime of violence" analysis, there would be two types of RICO conspiracies—what we will term here "generic" and "aggravated RICO conspiracies."

Mitchell's and Simmons' position also carries merit. All of the decisions cited above, except *Mathis*, were decisions based on constitutional principles. *Apprendi* and its progeny "rest[] entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize." *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004); *see also, e.g.*, *United States v. Cornette*, 932 F.3d 204, 210 (4th Cir. 2019) (explaining that *Alleyne v. United States*, 570 U.S. 99 (2013), which held that all facts that increase mandatory minimums are "elements," "created a new prospective *procedural* right *within the context of sentencing*" (emphases added)); *United States v. Sanders*, 247 F.3d 139, 147 (4th Cir. 2001) (noting that *Apprendi* only "dictates what fact-finding procedure must be employed to ensure a fair trial"). So there is a clear argument to be made that *Apprendi* eliminated the distinction between an "element" and a "sentencing enhancement," but only insofar as the question was "'who decides,' judge or jury" under the Fifth Amendment's Due Process Clause and the Sixth Amendment's right to a jury trial. *Ring*, 536 U.S. at 604–05. Indeed, one can reasonably read *Mathis* as preserving the distinction between an "element" and a "sentencing enhancement" for purposes of deciding which elements comprise the underlying *crime of conviction*.

22

If this latter view prevailed, then the RICO conspiracy statute would be deemed indivisible, because § 1963(a) only functions as a sentencing enhancement. The *crime of conviction*, § 1962(d), is completed as soon as two or more defendants agree to commit two or more racketeering acts in furtherance of a RICO enterprise. *See Mouzone*, 687 F.3d at 218. While in this case *Apprendi* required the jury to find that Simmons and Mitchell committed the alleged murders for each to have received a life sentence on Count One, that was irrelevant to the jury's determination of guilt or innocence on the charged conspiracy. A peek at the *Shepard* documents confirms this point, as the SSI, jury instructions, and verdict forms do not define the substantive murder offenses as substantive elements of the RICO conspiracy conviction. *See* J.A. 172–73 (SSI); J.A. 5248–49 (Jury Instructions); J.A. 6313–14, 6321–22 (Verdict Forms); *cf. Mathis*, 136 S. Ct. at 2256–57 (noting that courts may "peek at the record documents . . . for the sole and limited purpose of determining whether the listed items are elements of the offense" (citation, alterations, and internal quotation marks omitted)). We would thus apply the categorical approach to just the three elements that appear in § 1962(d).

Ultimately, we need not definitively decide this thorny divisibility issue. Whether the RICO conspiracy statute is divisible or indivisible, we conclude that Mitchell's and Simmons' RICO conspiracy convictions are not categorically a crime of violence.

2.

We proceed first under Mitchell's and Simmons' construct. This approach would treat the RICO conspiracy statute as indivisible and thus solely require implementation of

the categorical approach to determine whether § 1962(d)'s three elements necessarily entail the use, attempted use, or threatened use of physical force. *See Bryant*, 949 F.3d at 172.

Every circuit to consider whether a RICO conspiracy is a "crime of violence" has held, under the categorical approach, that it is not. *See United States v. Green*, 981 F.3d 945, 951–52 (11th Cir. 2020); *United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019) (per curiam); *United States v. Davis*, 785 F. App'x 358, 360–61 & n.2 (9th Cir. 2019) (per curiam). We could reach the same result here despite the presence of the § 1963(a) sentencing enhancement. As noted, the § 1962(d) offense is complete once the *agreement* is reached, *see Salinas*, 522 U.S. at 63, 65, because "the object of a RICO conspiracy is 'to engage in racketeering,' not to commit each predicate racketeering act." *United States v. Gutierrez*, 963 F.3d 320, 343 (4th Cir. 2020) (citation omitted), *cert. denied*, 141 S. Ct. 1112 (2021); *accord Green*, 981 F.3d at 952 ("[T]he elements of a RICO conspiracy focus on the *agreement* to commit a crime[.]"). Just as with a conspiracy to commit Hobbs Act robbery, reaching the agreement to violate the RICO statute through some future pattern of racketeering activity "does not invariably require the actual, attempted, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233–34 (4th Cir. 2019) (en banc); *accord Green*, 981 F.3d at 951–52.

In sum, assuming that a statutory factor that enhances a sentence is not necessarily an "element" of the underlying crime of conviction, we could hold that Simmons' and Mitchell's RICO conspiracy convictions are not categorically crimes of violence, despite their subsequent commission of first-degree murder in furtherance of the conspiracy.

24

3.

Conversely, assuming that the Government is correct that the RICO conspiracy statute is divisible between (1) "generic" conspiracies in which racketeering acts not punishable by life imprisonment, or no racketeering acts at all, were actually committed, and (2) "aggravated" conspiracies in which a racketeering act punishable by life imprisonment was committed, we would need to employ the modified categorical approach before proceeding further.

Importantly, the modified categorical approach does not permit a conduct-specific analysis in determining whether a particular crime is a crime of violence under 18 U.S.C. § 924(c). *See Mathis*, 136 S. Ct. at 2251 (noting the Court's "mantra" that in categorical analyses, courts "may only look to the elements of the [offense], not to the facts of [the] defendant's conduct" (alterations in original) (internal quotation marks omitted)); *Descamps*, 570 U.S. at 261 ("The key . . . is elements, not facts."). Rather, it "is simply 'a tool for implementing the categorical approach.'" *Bryant*, 949 F.3d at 173 (quoting *Descamps*, 570 U.S. at 262). We employ the modified categorical approach "for the sole purpose of determining 'which of the statute's alternative elements formed the basis of the defendant's prior conviction.'" *Id.* (quoting *Descamps*, 570 U.S. at 262); *accord Mathis*, 136 S. Ct. at 2253 ("[T]he modified [categorical] approach serves—and serves solely—as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque."). So, "once a court has isolated the specific crime of conviction, it must apply the traditional categorical approach . . . to determine whether that crime constitutes a 'crime of violence' under § 924(c)'s force

25

clause." *Bryant*, 949 F.3d at 173 (citing *Mathis*, 136 S. Ct. at 2249, 2256; and then citing *Mathis*, 932 F.3d at 265 & n.23)).

Following that strict guidance, we consult the *Shepard* documents solely to determine for which of the two types of RICO conspiracies Simmons and Mitchell were convicted. In doing so, the special verdict forms show that they were convicted of an "aggravated" RICO conspiracy, in the Government's parlance. The jury specifically found (1) that Simmons and Mitchell were guilty of a RICO conspiracy, and (2) that both were guilty of committing several murders under Virginia law "as part of the racketeering conspiracy." J.A. 6313–14 (Simmons' Verdict Form); J.A. 6321–22 (Mitchell's Verdict Form). And first-degree murder is punishable by life imprisonment in Virginia. *See* Va. Code Ann. §§ 18.2–10, –32.

According to the Government, we must now apply the categorical approach to *that fact specific* aggravated RICO conspiracy—a RICO conspiracy in which the racketeering acts of Virginia first-degree murder were committed—to determine the crime of violence factor. Since first-degree murder under Virginia law is itself a crime of violence, the Government argues that Simmons' and Mitchell's RICO conspiracy convictions must also be a "crime of violence." However, as explained below, that is not a faithful application of the modified categorical approach. Applying that approach as *Descamps* and *Mathis* demand, even an aggravated RICO conspiracy is not categorically a "crime of violence."

Once we utilize the modified categorical approach to determine the crime of conviction at issue, we "must apply the traditional categorical approach" to that crime's

26

elements. *Bryant*, 949 F.3d at 173 (citations omitted). There are four required elements in an aggravated RICO conspiracy prosecution:

(1)     "that an enterprise affecting interstate commerce existed";

(2)     "that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise";

(3)     "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts"; and

(4)     the defendant committed a "racketeering activity," as that term is defined in 18 U.S.C. § 1961, that carries a maximum statutory penalty of life imprisonment.

*Mouzone*, 687 F.3d at 218 (citations and internal quotation marks omitted) (describing the first three elements); 18 U.S.C. § 1963(a) (providing the fourth element). As explained above, the first three elements do not require any use, attempted use, or threatened use of physical force. Our task is to then determine whether the "minimum conduct necessary" to satisfy the final element—the commission of a racketeering act carrying a maximum statutory penalty of life imprisonment— necessarily entails the use, attempted use, or threatened use of force. *Bryant*, 949 F.3d at 172 (citation and internal quotation marks omitted).

The RICO statute is somewhat unique in that the Government would satisfy its burden on the final element of an aggravated RICO conspiracy by proving not the presence of just one fact, but instead that the elements of another criminal offense are satisfied. Indeed, § 1961(1) lists a number of crimes which can serve as the *means* for satisfying that element of an aggravated RICO conspiracy as they authorize the imposition of a life

27

sentence. *See Mathis*, 136 S. Ct. at 2256. So to prevail here, the Government must show that the minimum conduct necessary to complete *any* racketeering act qualifying for an aggravated RICO conspiracy includes the use, attempted use, or threatened use of physical force. The Government cannot meet that burden as a matter of law as three nonexhaustive examples demonstrate.

First, Mitchell and Simmons could have engaged in racketeering activity involving the distribution of controlled substances. Distributing more than one kilogram of heroin and more than 50 grams of methamphetamine are two such acts, *see* 18 U.S.C. § 1961(1)(D), both of which can be punished by life imprisonment, 21 U.S.C. § 841(a)(1), (b)(1)(A)(i), (viii). These completed distribution acts would justify the imposition of a life sentence for the aggravated RICO conspiracy under 18 U.S.C. § 1963(a); however, drug distribution does not require the use, attempted use, or threatened use of physical force.[10]

Second, an aggravated RICO conspiracy may lie where the defendants committed acts of sex trafficking by force, fraud, or coercion. *See* 18 U.S.C. §§ 1591(a), 1961(1)(B), 1963(a). But because sex trafficking "may be committed nonviolently—i.e., through

---

[10] Typically if a firearm is involved in a drug distribution offense, the Government will prosecute that offense under 18 U.S.C. § 924(c)(1)(A)'s tandem provision prohibiting the use or carry of a firearm "in relation to any . . . drug trafficking crime," which has a different statutory definition than the term at issue here, "crime of violence," *compare* § 924(c)(2) (defining "drug trafficking crime"), *with id.* § 924(c)(3) (defining "crime of violence"). While § 924(c)(1)(A) convictions readily lie for drug distribution offenses because they are "drug trafficking crime[s]," that does not inform us if a drug distribution offense is also a "crime of violence."

28

fraudulent means," *United States v. Fuertes*, 805 F.3d 485, 499 (4th Cir. 2015), such an aggravated RICO conspiracy would not be a categorically violent one.

Third, an "act or threat involving murder" that is "chargeable under State law" necessarily includes not only first-degree murder, but also conspiracy to commit first-degree murder. *United States v. Fernandez*, 388 F.3d 1199, 1259 (9th Cir. 2004) ("It is a well-established principle of RICO law that . . . predicate racketeering acts that are themselves conspiracies may form the basis for a . . . § 1962(d) [conviction]."). In some states, like Maryland,[11] conspiracy to commit first-degree murder is punishable by life imprisonment, which again would justify an aggravated RICO conspiracy conviction. *See* Md. Code Ann., Crim. Law §§ 1-202, 2-201; *Gary v. State*, 671 A.2d 495, 520–21 (Md. 1996) (holding that Maryland's conspiracy statute authorized a life imprisonment sentence for conspiring to commit first-degree murder). But because "conspiracy alone does not necessarily implicate the use of force," *United States v. Runyon*, 994 F.3d 192, 203 (4th Cir. 2021) (citing *Simms*, 914 F.3d at 234), such an aggravated RICO conspiracy would not be a crime of violence, either.

In sum, given the number of readily apparent, statutorily provided means by which a defendant may complete the final element of an aggravated RICO conspiracy without using, attempting to use, or threatening to use physical force, we hold that an aggravated RICO conspiracy is not categorically a crime of violence.

---

[11] We use Maryland as a representative example instead of Virginia because Virginia law only provides a ten-year statutory maximum penalty for conspiracies to commit murder. *See* Va. Code Ann. §§ 18.2–10(e), –22(a)(2), –32.

The Government's argument to the contrary suffers from two fatal flaws. First, it arbitrarily assumes that our categorical analysis must look only to the particular racketeering acts that Simmons and Mitchell committed in this particular case. That approach improperly injects an extra level of divisibility into the crime of violence analysis that neither the categorical nor modified categorical approach permits. Section 1961(1) creates an entire category of offenses that can give rise to an aggravated RICO conspiracy conviction, but critically, a defendant can be sentenced for life whether his aggravated RICO conspiracy was based on Virginia first-degree murder or the distribution of over one kilogram of heroin. Thus, § 1961(1) lists the *means*—the "alternative methods"—of committing an aggravated RICO conspiracy, not additional elements for committing that offense. *Mathis*, 136 S. Ct. at 2256 (alteration and quotation marks omitted); *see also Cabrera-Umanzor*, 728 F.3d at 351, 353 (holding that a Maryland child abuse statute's definition of "sexual molestation or sexual exploitation" to include the crimes of incest, rape, and sodomy (among others) did not render the statute divisible because the enumerated crimes were simply the "means by which the elements of sexual molestation or sexual exploitation can be committed"). *Mathis* thus requires that our categorical analysis consider *the entire class* of qualifying racketeering acts, not just the specific ones that Simmons and Mitchell committed in this case.

Second, and relatedly, the cases that the Government relies upon, principally *Burrage v. United States*, 571 U.S. 204 (2014), *Runyon*, 994 F.3d 192, and *United States v. Tsarnaev*, 968 F.3d 24 (1st Cir. 2020), *cert. granted on other grounds*, No. 20-443, 141 S. Ct. 1683 (U.S. Mar. 22, 2021), are inapposite. The element that made the offenses in

those cases crimes of violence required proof of just a single fact: a death resulting from the conspiracy. *See Burrage*, 571 U.S. at 209–10 (quoting and discussing 21 U.S.C. § 841(b)(1)(A)–(C)); *Runyon*, 994 F.3d at 201–02 (quoting and discussing 18 U.S.C. § 1958(a)); *Tsarnaev*, 968 F.3d at 103–04 (quoting and discussing 18 U.S.C. §§ 2332a(a)). In other words, unlike the broader category of aggravated RICO conspiracies here, the category in those cases was limited only to offenses where death resulted. As we noted in *Runyon*, "an act that results in death obviously requires 'physical force.'" 994 F.3d at 203 (citation omitted). But aggravated RICO conspiracies are different, for defendants can satisfy the final element of that crime by committing *some other crime*, as specified in § 1961(1). Some cases, like this one, may result in death; in others, as explained in detail above, no utilization of physical force need occur. That factor plainly distinguishes the statutes at issue in *Burrage*, *Runyon*, and *Tsarnaev* from the aggravated RICO conspiracy here.

In essence, what the Government attempts to do is inject into the "crime of violence" inquiry a conduct-specific analysis. It seeks to have courts look only at the precise racketeering acts completed to determine whether the defendant's particular aggravated RICO conspiracy is a crime of violence instead of just one of many available means in that category of offenses. While Simmons' and Mitchell's conspiracy conviction may have been a crime of violence in a colloquial sense under the facts of this specific case, the Supreme Court bars utilizing such a fact-specific approach. Indeed, the Government's "case-specific reading" here would make the force clause "apply to conduct [it has] not previously been understood to reach: categorically nonviolent felonies committed in

31

violent ways." *Davis*, 139 S. Ct. at 2332 (citing *Simms*, 914 F.3d at 256–57 (Wynn, J., concurring)); *see also United States v. Barrett*, 937 F.3d 126, 129–30 (2d Cir. 2019) (explaining that *Davis* explicitly rejected any reliance on the "particular murderous violence of [the defendant's] robbery conspiracy" under both § 924(c)(3)(A) and (B)). Just as the Supreme Court has done time and again, we reject such a reading.

In sum, we hold that both generic and aggravated RICO conspiracies are not "crime[s] of violence" under 18 U.S.C. § 924(c)(3)(A). Accordingly, we affirm the district court's decision to vacate Simmons' and Mitchell's convictions as to Count 30.

## IV.

We turn now to Defendants' cross-appeals, which assert three categories of error. Initially, they take issue with two of the district court's evidentiary rulings, which allowed the jury to consider as substantive evidence: (1) charts containing combined summaries of cell site location information ("CSLI") data, text messages, and Virginia Department of Transportation ("VDOT") license plate reader data; and (2) the alleged hearsay statements of Nino and Skino during a phone call.

Next, Defendants claim three separate errors in the trial court's jury instructions. First, they argue that the trial court reversibly erred in declining to give the jury a "multiple conspiracies" instruction. Second, they assert that the trial court's formulation of the co-conspirator liability instruction, which essentially mirrored *United States v. Pinkerton*, 328 U.S. 640 (1946), was plain error. Third, they posit that the trial court constructively amended the VICAR Assault Counts through its jury instructions on those counts.

32

Finally, Defendants challenge the sufficiency of the evidence underlying various findings of guilt.

We consider each argument in turn.

A.

We review a district court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006). A trial court abuses its discretion if it applies the wrong law, if its decision "rests upon a clearly erroneous factual finding," or if we are otherwise left with a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citations and internal quotation marks omitted). But even if the trial court made such an evidentiary error, it is subject to harmless error review. Fed. R. Civ. P. 61; *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009).

1.

At trial, the district court admitted, over Defendants' objections, certain summary charts created by the Government's CSLI expert witness. *See* J.A. 6030–68. These charts compiled summaries of CSLI data obtained from Defendants', Foye's, and Davis' phones and placed them on a map to provide a visual representation of their movements on a given night. Some charts also contained excerpts from Defendants' phones' text message logs, and/or license plate pictures captured by VDOT cameras at toll plazas in the Virginia Beach and Norfolk areas. *See, e.g.*, J.A. 6051.

The Federal Rules of Evidence provide two ways for a party to use summary charts at trial. Rule 1006 permits summary charts to be admitted into evidence "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). And Rule 611 permits the admission of summary charts "to facilitate the presentation and comprehension of evidence already in the record." *Id.* at 273; *see also United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995).[12]

The only potentially meritorious argument that Defendants raise is that the trial court impermissibly instructed the jurors that they could consider all the summary charts as independent evidence, and "give them such weight or importance, if any, as you feel they deserve." J.A. 5226. In the ordinary case, Defendants might have a colorable argument that this instruction conflicts with our precedent stating that district courts should give a limiting instruction for charts admitted under Rule 611 in order to ensure that the jury does

---

[12] In *Johnson*, we expressly disagreed with other circuits that appeared to suggest that summary charts introduced under Rule 611(a) may not be formally admitted into evidence. 54 F.3d at 1159. But later we suggested in dicta that Rule 611(a) summary charts may not be admitted as substantive evidence and are permitted solely to facilitate the jury's understanding of the evidence. *See Janati*, 374 F.3d at 273 ("Whenever pedagogical charts are employed [under Rule 611(a)], however, the court should make clear to the jury that the charts are not evidence themselves, but are displayed to assist the jury's understanding of the evidence."). That dictum was endorsed by a 2019 panel in *United States v. Oloyede*, 933 F.3d 302, 310–11 (4th Cir. 2019).

But even if we were to consider *Oloyede*'s endorsement of *Janati* essential to its holding, "one panel cannot overrule a decision issued by another panel." *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc). And if two decisions conflict, the earlier controls. *Id.* at 333. For that reason, reliance on *Janati* is misplaced. *Johnson* governs this question—summary charts may be admitted into evidence under Rule 611(a). 54 F.3d at 1159.

not "rely[] on that chart as 'independent' evidence," but instead focuses its deliberations on "the evidence upon which that chart is based." *Johnson*, 54 F.3d at 1159; *see also United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997).[13] But Defendants, along with the Government, jointly proposed this instruction to the trial court. *See* Prop. Jury Instr. No. 17, *Simmons*, No. 2:16-cr-130 (E.D. Va. filed Mar. 15, 2018), ECF 388-1. We fail to see how the trial court abused its discretion based on this allegedly prejudicial instruction when Defendants asked for it and thus invited the error. *See Mathis*, 932 F.3d at 257–58 (refusing to find error in a jury instruction that the defendant proposed, and the court gave, because the defendant "invited the claimed error"); *see also United States v. Mark*, 943 F.2d 444, 449 (4th Cir. 1991) (holding that no error occurs if a trial court "fail[s] to give a limiting instruction for a defendant where one was never requested," even in situations where such an instruction is warranted). Accordingly, we decline to vacate Defendants' convictions on this ground.[14]

---

[13] No limiting instruction is required for summary charts admitted under Rule 1006 because Rule 1006 summaries are independent evidence, *see Janati*, 374 F.3d at 273, while Rule 611 charts are only a summary of otherwise admitted evidence, *see Johnson*, 54 F.3d at 1159.

[14] As a final note, Defendants take issue with the district court's decision to allow the Government to recall its CSLI expert witness. After the Government called its CSLI expert, but well before closing its case-in-chief, it noticed that the CSLI summary charts already admitted did not include CSLI data for Davis' phone. The court allowed the Government to recall the expert over Defendants' objections. When the court learned of the issue, it adjourned court at 12:21 p.m. that day, at Defendants' counsels' request, so that they could analyze the updated charts and prepare for additional cross-examination of the Government's expert. And the expert was in fact subjected to additional cross-examination on the updated charts. Thus, to the extent that Defendants claim prejudice from the Government being allowed to recall this expert, we believe that the district court (Continued)

2.

The district court also permitted the jury to hear, as substantive evidence, a phone call between Skino and Nino. Defendants claim that this was prejudicial error, because the contents of that call were inadmissible hearsay. We review for plain error because the phone call was admitted without objection. J.A. 2161–62.[15] To demonstrate plain error, Defendants must show that: (1) there was error; (2) the error was plain; and (3) the error affected their substantial rights. *Olano*, 507 U.S. at 732–34. But because our plain error review is discretionary, the Supreme Court has instructed that we "should not exercise" our discretion to recognize a plain error unless Defendants make a fourth showing: that the plain error affecting substantial rights also "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," *id.* at 732, 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). We find no error, let alone plain error, in the call's admission.

During the challenged December 23, 2015, phone call, Skino (the leader of a Virginia Beach-based Nine Trey line and Simmons' rival) and Nino (one of Skino's Generals) discussed Skino's ongoing "beef" with Simmons. Mitchell was present with

---

adequately deployed the trial management mechanisms at its disposal to mitigate that concern.

[15] When the Government later tried to replay a part of the call, one of the defendants' counsel objected on the grounds that the call had not been properly authenticated. J.A. 4592. It was only during this sidebar that the Government explained that the previously admitted call was not hearsay. J.A. 4598.

Nino during the call, and Nino enabled the speaker phone setting on his cell phone so that Mitchell could hear everything that Skino said.

This call was not "hearsay," *see* Fed. R. Evid. 801(c), as the Government did not offer it for the truth of the matters asserted therein. For example, the Government did not wish to prove that Skino did in fact say that "the button's pushed on [Simmons]." J.A. 6226. Rather, the Government used this phone call to prove the effect that Skino's words had on their eventual listener, Simmons. Stated differently, the focus here was not to prove as true the reasons for the "beef" as stated on the call, but to prove how those reasons caused Simmons to react just days later. Thus, the trial court did not err in admitting the statements in the call as non-hearsay.

B.

We turn next to the claimed errors in the district court's jury instructions. We review these challenges for an abuse of discretion. *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013). Defendants "face[] a heavy burden, for 'we accord the district court much discretion' to fashion the charge." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (citation omitted). We review each challenged instruction "holistically" to determine whether it "adequately informed the jury" of the law, without misleading or confusing the jury. *Id.* (citation and internal quotation marks omitted). If a defendant claims that the district court improperly failed to give a proposed instruction, we will reverse only if it is shown that the proposed instruction: "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its

37

case." *Id.* at 586–87 (internal quotation marks omitted) (quoting *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010)).

1.

Defendants first argue that the district court was required to give their requested "multiple conspiracies" instruction, because the December 23 call between Skino and Nino allegedly "established that Skino's line, including Blacko, Lanez, and Nino, were a separate enterprise with competing objectives from the RICO conspiracy charged in Count One." Cross-Opening Br. 83–84.

A multiple conspiracies instruction is appropriate where "the proof at trial demonstrates that [Defendants] were involved only in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *United States v. Cannady*, 924 F.3d 94, 101 (4th Cir. 2019) (quoting *United States v. Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994)). Such an instruction is designed to abate the risk that a jury will "imput[e] guilt to [a defendant] as a member of one conspiracy because of the illegal activity of members of [an]other conspiracy." *United States v. Roberts*, 262 F.3d 286, 294 (4th Cir. 2001).

The trial court did not abuse its discretion in refusing to give a multiple conspiracies instruction. At most, the evidence showed that Simmons and Skino were rivals within the same RICO enterprise. "To the extent that [D]efendants seek to establish a legal principle that members of warring factions within an umbrella conspiracy necessarily lack the unity of interest to be conspirators in the umbrella conspiracy, we reject that principle." *United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002). As several of our sister circuits have aptly reasoned, "[t]he existence of an internal dispute does not signal the end of an

38

enterprise, particularly if the objective of, and reason for, the dispute," like here, "is control of the enterprise." *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994); *see also United States v. Fernandez*, 388 F.3d 1199, 1222–23 (9th Cir. 2004) (holding that despite the presence of two warring factions, a single conspiracy existed, because the factions "still identified themselves as members" of the gang, "invoked the reputation and power of the group" when dealing with outsiders, "and expected the entire organization to endure beyond the 'war'"), *as amended*, 425 F.3d 1248 (9th Cir. 2005); *Marino*, 277 F.3d at 25–26; *United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir. 1991) (holding that a gang was a single enterprise despite "violent in-fighting," because the gang's "power structure endured and its members functioned as a unit"). Thus, there is no error here.

2.

Next, Defendants claim that the district court reversibly erred in instructing the jury on the principles of co-conspirator liability, because the instruction was largely modeled on the Supreme Court's decision in *Pinkerton*. They contend that such an instruction is incompatible with Virginia law because Virginia has not adopted a *Pinkerton* theory of co-conspirator liability. Again, we disagree.

The final version[16] of the co-conspirator liability instruction, Instruction 39, read:

> There are two ways that the government can prove a particular defendant guilty of the substantive crimes charged in the second superseding indictment. The first is by proving that a particular defendant personally

---

[16] This was not the first version of Instruction 39 read to the jury. The initial version of the instruction, the Government later conceded, potentially imposed a broader basis of co-conspirator liability than allowed by law. Accordingly, the Government proposed narrowing the scope of the instruction, to which no Defendant objected.

committed, participated in or aided and abetted the individual crime . . . . Second is based on the legal rule that all members of a conspiracy are responsible for the acts committed by the other members, as long as those acts are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the agreement. In other words, under certain circumstances, the act of one conspirator may be treated as the act of all. This means that all the conspirators may be convicted of a crime committed by only one of them, even though they did not all personally participate in that crime themselves. In other words, a member of a conspiracy who commits a crime during the existence or life of the conspiracy and commits the crime in order to further or somehow advance the goals or objectives of the conspiracy may be considered by you to be acting as the agent of the other members of the conspiracy. The illegal actions of this conspirator in committing the substantive crime may be attributed to other individuals who are at the time members of the conspiracy, so long as the commission of that substantive crime was reasonably foreseeable to those other individuals. Under certain conditions, therefore, a defendant may be found guilty of a substantive crime even though he did not participate directly in the acts constituting that offense.

J.A. 5343–44.

Because Defendants never objected to this instruction, *see* J.A. 5340–41, we review their challenge for plain error, Fed. R. Crim. P. 52(b); *Olano*, 507 U.S. at 731–32. Our plain error review ends at the first step, for we can divine no error in the trial court's co-conspirator liability instruction. Instead, the trial court's instruction is wholly consistent with Virginia law governing co-conspirator liability. *See, e.g.*, *Brown v. Commonwealth*, 107 S.E. 809, 811 (Va. 1921) ("All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime." (citation and internal quotation marks omitted)); *Owens v. Commonwealth*, 675 S.E.2d 879, 881 (Va. Ct. App. 2009) ("[A] co-conspirator may be criminally liable for an act of another member of the conspiracy if

40

the act is 'done in the furtherance of the conspiracy' and can 'be reasonably foreseen as a necessary or natural consequence of the' conspiracy." (quoting *Pinkerton*, 328 U.S. at 647–48)). We therefore reject Defendants' argument as to Instruction 39.

C.

Defendants assert that the district court's third and final claimed instructional error resulted in a constructive amendment of the VICAR Assault Counts. We agree, and therefore reverse Defendants' respective convictions on these counts.

1.

The SSI predicated the VICAR Assault Counts on two state law offenses: violations of Va. Code Ann. §§ 18.2-53.1 and 18.2-282. Section 18.2-53, which was not charged in the SSI, deems it unlawful for any person committing or attempting to commit a felony to "unlawfully shoot, stab, cut or wound another person." But section 18.2-53.1 more harshly punishes a different category of conduct, deeming it "unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit" a specified list of felonies, including murder. Section 18.2-282, Virginia's general brandishing statute, deems it unlawful "for any person to point, hold or brandish any firearm or any air or gas operated weapon or any object similar in appearance, whether capable of being fired or not, in such manner as to reasonably induce fear in the mind of another."

The instructions that the parties *jointly* proposed to the district court did not accurately track the SSI. Those proposed instructions correctly referenced section 18.2-282 as one of the two state law predicates supporting the VICAR Assault Counts, but

41

incorrectly referenced section 18.2-53 (not section 18.2-53.1, as stated in the SSI) as the second state law predicate offense. *See* Prop. Instr. Nos. 74, 76, *Simmons*, No. 2:16-cr-130, ECF 388-1.[17] And when it came to explaining to the jury the elements of the two state law offenses undergirding the VICAR Assault Counts, Proposed Instruction 80 correctly defined the elements of section 18.2-282, but incorrectly referenced and explained the elements of section 18.2-53, not section 18.2-53.1. *See* Prop. Instr. No. 80.[18]

These errors permeated the court's final jury instructions on all of the VICAR Assault Counts. Just like the proposed instructions, the district court correctly referenced and explained to the jury the elements of section 18.2-282 as one of the two state law predicates. J.A. 5298; *see Kelsoe v. Commonwealth*, 308 S.E.2d 104, 104 (Va. 1983) (per curiam) (setting forth section 18.2-282's elements). However, the court incorrectly explained and referenced section 18.2-53 as the other state law predicate, instead of the actual predicate charged in the SSI, section 18.2-53.1.

---

[17] The lone exception was Count 8, which the parties correctly identified in one proposed instruction as being predicated upon a violation of section 18.2-53.1. Prop. Instr. No. 76, *Simmons*, No. 2:16-cr-130, ECF 388-1. The other proposed instructions relating to Count 8, however, incorrectly referenced section 18.2-53. *See* Prop. Instr. Nos. 74, 80.

[18] A criminal defendant is often not entitled to reversal of his conviction where he invites the error he complains of on appeal. *See, e.g.*, *United States v. Herrera*, 23 F.3d 74, 75–76 (4th Cir. 1993). That is especially true on plain error review, for "an error that was invited by the appellant 'cannot be viewed as one that affected the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Lespier*, 725 F.3d 437, 450 (4th Cir. 2013) (quoting *United States v. Gomez*, 705 F.3d 68, 76 (2d Cir. 2013)). The Government has not raised this argument on appeal, and we offer no view on whether this occurred or any consequence of it.

Neither Defendants nor the Government brought this mistake to the attention of the district court. In fact, it was the district court that first noticed it in ruling on Defendants' final post-trial motions. But the court did not address the legal significance of it, observing that "perhaps for their own valid reasons, neither party has raised such apparent incongruity before this Court." *Simmons*, 2018 WL 6012368, at *5 n.6.

Ultimately, the jury convicted Defendants of the VICAR Assault Counts, but did so on a general verdict form for each defendant. Thus, the jurors were not asked to specify if they found either, or both, of the Virginia state law predicates underlying those counts satisfied. All the verdict form asked was whether the jury found Defendants guilty of the VICAR Assault Offense alleged in the relevant count.

2.

Because Defendants did not object to the trial court's instructions on the VICAR Assault Counts, we review only for plain error. *See* Fed. R. Crim. P. 52(b); *Olano*, 507 U.S. at 731–32. It appears uncontested, and we agree, that a "clear" and "obvious" error occurred here. *Olano*, 507 U.S. at 734. The trial court should not have instructed the jury on Va. Code Ann. § 18.2-53, which proscribes a different criminal offense than the one charged in the SSI, section 18.2-53.1. Before proceeding to the third *Olano* prong, whether the error affected Defendants' substantial rights, we pause to determine *what kind* of error occurred, for the characterization of that error significantly impacts the analysis.

Defendants argue that the instructional error amounted to a constructive amendment of the VICAR Assault Counts. Because section 18.2-53 proscribes a wider range of conduct than section 18.2-53.1, they posit that the district court impermissibly broadened the basis

43

for their convictions. Therefore, Defendants contend, we must correct the error, even on plain error review, because in our circuit constructive amendments are "error *per se*." *United States v. Floresca*, 38 F.3d 706, 714 (4th Cir. 1994) (en banc).

The Government counters that there was no constructive amendment, and instead posits that we should view this case as a species of "alternative theory" instructional error. It asserts that the error here "affected just one of two alternative state-law predicates presented to the jury," thereby concerning only "the *predicate*, not the *count*." Cross-Response Br. 18, 23 (emphases in original). As a result, the Government concludes, we should assess the error "under the rubric of harmlessness to determine whether the count survives in view of the strength of the evidence on any still-valid theories of conviction." Cross-Response Br. 23.

By instructing on the broader section 18.2-53 unalleged predicate instead of the narrower section 18.2-53.1 alleged predicate, the district court's jury instructions broadened the possible basis for conviction on each of the VICAR Assault Counts. Further, without a special jury verdict form, we cannot know whether the jury convicted Defendants based on the properly-indicted, properly-instructed section 18.2-282 predicate, or the unindicted, improper section 18.2-53 predicate. Under our binding precedent, we are constrained to find that a constructive amendment occurred and that Defendants' convictions on the VICAR Assault Counts must be reversed even on plain error review.

a.

The Fifth Amendment's Grand Jury Clause "guarantees that a criminal defendant will be tried only on the charges in a grand jury indictment," so "only the grand jury may

broaden or alter the charges in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (citation and internal quotation marks omitted). "A constructive amendment to an indictment occurs when either the [G]overnment (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the *possible bases* for conviction beyond those presented by the grand jury." *Floresca*, 38 F.3d at 710 (emphasis added). As the Supreme Court has explained: "court[s] cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). Thus, the resulting incongruity between the indictment and the conviction that a constructive amendment causes "destroy[s] the defendant's substantial right to be tried only on charges presented in [the] indictment." *Id.*

*Stirone* is not materially distinguishable from the case before us. There, the grand jury indicted Stirone under the Hobbs Act for unlawfully obstructing interstate commerce, to wit the movement of sand. *Id.* at 213–14. But at trial, the Government introduced evidence that he also interfered with steel shipments, and the district court instructed the jury that the interstate commerce element of his Hobbs Act charge could be satisfied "*either* on a finding that" Stirone obstructed the movement of sand *or* steel. *Id.* at 214 (emphasis added). This, the Supreme Court held, amounted to a constructive amendment, in violation of the Fifth Amendment's Grand Jury Clause. "[W]hen only one particular kind of commerce is charged to have been burdened[,] a conviction must rest on that charge and not another[.]" *Id.* at 218. By allowing the jury to convict Stirone based on the uncharged allegations of interfering with steel, "the basic protection the grand jury was designed to

afford is defeated," for one "cannot know whether the grand jury would have included in its indictment a charge that commerce in steel . . . had been interfered with." *Id.* at 218–19. Because interference with steel "might have been the basis" for Stirone's conviction, the district court committed a "fatal," reversible error. *Id.* at 219.

The same principles apply here. In *Stirone* terms, section 18.2-282 is our "sand," and section 18.2-53 is our "steel." The jury's convictions on the VICAR Assault Counts could have rested "either on a finding" that in furtherance of a RICO enterprise, Defendants committed assault with a dangerous weapon, as that offense is defined by section 18.2-53 (an unindicted predicate) *or* brandishment under section 18.2-282 (one of the indicted predicates). *Id.* at 214; *see* 18 U.S.C. § 1959(a)(3). But we have no way of knowing the basis for conviction. "[W]e cannot know whether the grand jury would have included [section 18.2-53] in its indictment" as a third alternative predicate charge, yet because of the district court's jury instruction and the use of a general verdict form, "this might have been the basis upon which the trial jury convicted [Defendants]." *Stirone*, 361 U.S. at 219. Because section 18.2-53 provided the jury with a broader basis for a VICAR Assault conviction than the predicate offenses alleged in the indictment (sections 18.2-53.1 and 18.2-282), the district court's instruction on section 18.2-53 resulted in a constructive amendment of the SSI.[19] *See id.*; *see also Randall*, 171 F.3d at 210 (holding that where the

---

[19] By its terms, section 18.2-53 is not a lesser-included offense of section 18.2-53.1. *See Commonwealth v. Dalton*, 524 S.E.2d 860, 862 (Va. 2000) ("[A]n offense is not a lesser-included offense if it contains an element that the charged offense does not contain.").

Government specified a particular predicate offense in support of an 18 U.S.C. § 924(c) charge, "the district court was not allowed[,] through its jury instructions, to broaden the bases of conviction to include [a] different § 924(c) predicate offense"); *Floresca*, 38 F.3d at 711 (holding that a constructive amendment occurred because "[t]he jury was allowed to return a guilty verdict upon finding that Floresca approached Lopez with the intent to affect *either* his cooperation in the investigation *or* his testimony at trial").

Whether or not the Government's effort to read this case through our line of "alternative theory" instructional error cases is persuasive is of no consequence because precedent forecloses that argument. The Government has failed to distinguish our binding caselaw—*Stirone*, *Randall*, and *Floresca*—from the situation before us. Those cases make clear that the improper section 18.2-53 predicate instruction gave the jurors a broader basis to find Defendants guilty of each VICAR Assault Count than the section 18.2-53.1 predicate alleged in the SSI. So it is irrelevant that the court correctly instructed on the alternative predicate offense, section 18.2-282, for "it is the broadening [of the indictment] itself that is important—nothing more." *Floresca*, 38 F.3d at 711.

b.

Having determined that the trial court constructively amended the VICAR Assault Counts, we return to our plain error analysis under *Olano*. Sitting en banc in *Floresca*, this Court held that constructive amendments are structural errors, meaning that even under plain error review, constructive amendments must be considered "*per se*" prejudicial. *Id.* at 711–14. Stated differently, in our circuit, constructive amendments always affect a defendant's substantial rights, such that *Olano*'s third prong is satisfied. *Id.* at 712–14.

47

Further, *Floresca* mandates that we exercise our discretion under the fourth *Olano* prong to correct that error under Rule 52(b), because the possibility of "convicting a defendant of an unindicted crime affects the fairness, integrity, and public reputation of federal judicial proceedings in a manner most serious." *Id.* at 714.[20] We therefore follow that binding

---

[20] In a footnote, the Government "maintains that *Floresca* was wrongly decided and that an unpreserved claim of constructive amendment must satisfy the standards for plain error." Cross-Response Br. 20 n.1. There is a legitimate question as to whether *Floresca*'s *per se* reversal rule in plain error constructive amendment cases remains doctrinally sound in the wake of the Supreme Court's post-*Olano* plain error jurisprudence, most prominently the decisions in *Johnson v. United States*, 520 U.S. 461 (1997), *United States v. Cotton*, 535 U.S. 625 (2002), and *United States v. Marcus*, 560 U.S. 258 (2010). After all, while some courts treat the issue of prejudice for purposes of *Olano*'s third prong differently, we are the *only* circuit that requires a panel to exercise its discretion to notice and correct constructive amendments on plain error review. *See United States v. Brandao*, 539 F.3d 44, 57, 62–63 (1st Cir. 2008); *United States v. Thomas*, 274 F.3d 655, 671–72 (2d Cir. 2001) (en banc); *United States v. Syme*, 276 F.3d 131, 154 n.9 (3d Cir. 2002) (en banc); *United States v. Daniels*, 252 F.3d 411, 413–14 & n.8 (5th Cir. 2001); *United States v. Russell*, 595 F.3d 633, 643–44 (6th Cir. 2010); *United States v. Remsza*, 77 F.3d 1039, 1044 (7th Cir. 1996); *United States v. Gavin*, 583 F.3d 542, 546–47 (8th Cir. 2009); *United States v. Hugs*, 384 F.3d 762, 766–68 (9th Cir. 2004); *United States v. Brown*, 400 F.3d 1242, 1253–55 & n.6 (10th Cir. 2005); *United States v. Madden*, 733 F.3d 1314, 1319–20 (11th Cir. 2013); *United States v. Hall*, 610 F.3d 727, 743–44 (D.C. Cir. 2010).

A panel of this Court cannot overrule a prior precedential decision, let alone an en banc ruling. *See McMellon*, 387 F.3d at 332. But if our prior decision "rests on authority that subsequently proves untenable," *United States v. Williams*, 808 F.3d 253, 261 (4th Cir. 2015) (citation omitted), or the Supreme Court "specifically reject[s] the reasoning on which" it is based, *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090–91 (4th Cir. 1993), we are not bound by it.. The Government has not made that argument—that *Floresca* is no longer good law in light of the Supreme Court's opinions in *Johnson*, *Cotton*, and *Marcus*—before us. So we decline to take a position on whether that intervening precedent compels us to abandon parts of *Floresca*'s holding and apply the decision as it stands.

precedent today and hold that Defendants' respective convictions on the VICAR Assault Counts, Counts 8, 15, 18, 27, and 29, must be reversed.[21]

D.

Lastly, we address Defendants' remaining sufficiency claims. Criminal convictions "must be upheld" if, when viewing the evidence and all reasonable inferences therefrom "in the light most favorable to the Government," there is "substantial evidence" to support them. *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (citation and internal quotation marks omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). In this analysis, "[w]e also assume that the jury resolved all contradictions in testimony in favor of the [G]overnment," and if there are two or more reasonable interpretations of the evidence, the jury decides which one controls. *Moye*, 454 F.3d at 394. We also defer to the jury's credibility findings. *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007). Ultimately, Defendants' burden is "heavy," because reversal of the conviction is only appropriate "where the prosecution's failure is clear." *United*

---

[21] Reversing these convictions does not require reversing the related § 924(c) counts (Counts 9, 16, 19, and 28). The verdict forms for each Defendant asked the jury to specify which of the predicate offenses the jury found satisfied for each § 924(c) count, and for Counts 9, 16, 19, and 28, the jury found that the Government proved at least one valid predicate offense other than the VICAR Assault offenses. J.A. 6316–19, 6323–30, 6334. However, our holding here does mean that we need not address Defendants' alternative argument that section 18.2-282 is a legally insufficient predicate for a VICAR Assault offense. *See* Cross-Opening Br. 31–37.

49

*States v. Foster*, 507 F.3d 233, 244–45 (4th Cir. 2007) (citation and internal quotation marks omitted).

Defendants collectively argue that the evidence was insufficient, as a matter of Virginia law, to show that they "attempted" to murder Lanez or Nino. Simmons argues that the evidence was insufficient to prove that he was vicariously liable for any murders or attempted murders committed by his subordinates. Mitchell claims that the Government insufficiently proved that the murders and attempted murders he was involved in were in furtherance of the RICO enterprise. And Lassiter asserts that the evidence did not adequately prove that he was a member of the RICO conspiracy. We address each contention in turn.

1.

We begin with Defendants' challenges to their VICAR attempted murder convictions in Counts 22 (Lanez) and 24 (Nino), which respectively alleged that Defendants attempted to murder two of Skino's Generals, Lanez and Nino. In any VICAR prosecution, the Government must prove, beyond a reasonable doubt:

> (1) there was a RICO enterprise; (2) it was engaged in racketeering activity as defined in RICO; (3) the defendant in question had a position in the enterprise; (4) the defendant committed the alleged crime of violence; and (5) his general purpose in so doing was to maintain or increase his position in the enterprise[.]

*United States v. Zelaya*, 908 F.3d 920, 926–27 (4th Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994)). The challenges here to Counts 22 and 24 only address the fourth element, the commission of the substantive attempted murder offense.

50

Because the SSI only alleges that the attempted murders violated Virginia law, we look only to Virginia law in determining whether the attempted crime occurred. *Cf. Mathis*, 932 F.3d at 264–67 (determining whether various VICAR offenses were "crimes of violence" under 18 U.S.C. § 924(c) by reference to the state law predicate offense alleged in the indictment). First-degree murder under Virginia law includes "[m]urder . . . by any willful, deliberate, and premeditated killing." Va. Code Ann. § 18.2-32. Accordingly, there are two essential elements to an attempted murder prosecution under Virginia law: (1) a "specific intent to kill the victim"; and (2) some overt act in furtherance of that intent. *Commonwealth v. Herring*, 758 S.E.2d 225, 235 (Va. 2014) (internal quotation marks omitted) (quoting *Sizemore v. Commonwealth*, 243 S.E.2d 212, 214 (Va. 1978)). The question of intent is a factual one for the jury. *Epps v. Commonwealth*, 216 S.E.2d 64, 69 (Va. 1975).

a.

Defendants first posit that there was insufficient evidence of an intent to kill either Nino or Lanez. To the contrary, the record provides ample evidence for the jury's factual finding of intent. On December 27, 2015, Simmons gave his men the order to "mash the gas" on anyone in Skino's line who refused to jump to Simmons' line. J.A. 4153. Based on the testimony that "mash[ing] the gas" on someone meant to kill them, J.A. 1660, the jury was entitled to interpret Simmons' order as one to kill that his men were bound to follow under Nine Trey's tenets. Indeed, the fact that Simmons' men immediately left his house and went to Nino's apartment to carry out the order underscores their adoption of it. That the order was conditional—only "mash the gas" if Skino's men refused to jump lines–

51

–is of no moment. Under the common law, the "specific intent to commit a wrongful act may be conditional"; "[a]n intent to kill, in the alternative, is nevertheless an intent to kill." *Holloway v. United States*, 526 U.S. 1, 9–11 (1999) (citations and internal quotation marks omitted); *see also Nobles v. Commonwealth*, 238 S.E.2d 808, 810 (Va. 1977) (explaining that a conditional threat—that the defendant would kill the victim if she moved—was probative evidence of an intent to kill). Once Simmons' men learned that *no one* within Skino's line intended to abandon Skino, the jury could reasonably infer that Simmons and his subordinates intended to kill any of Skino's men that they encountered, including Nino and Lanez. Since no one was willing to switch lines, they were to "mash the gas" on all of them. *See, e.g.*, J.A. 4162 (Davis' testimony that if the men found Lanez that day, they "was gonna kill him. More than likely."). We therefore find the element of intent satisfied.

b.

Defendants' more weighty challenge is to the sufficiency of the evidence underlying the jury's finding that they took an "overt act" in furtherance of their intent to murder either Nino or Lanez. They assert that driving to Nino's apartment and knocking on his door were merely preparatory actions, and cannot constitute an "overt act." Similarly, they argue that driving to an empty house where they thought Lanez lived, and then leaving, was also a merely preparatory act. As explained below, only the argument regarding Lanez is meritorious.

Virginia follows the common law of attempt. *Jones v. Commonwealth*, 826 S.E.2d 908, 913 (Va. Ct. App. 2019) (en banc). At common law, an act is an "attempt" if it "possess[es] four characteristics: first, it must be a step toward a punishable offense;

52

second, it must be apparently (but not necessarily in reality) adapted to the purpose intended; third, it must come dangerously near to success; [and] fourth, it must not succeed." *Id.* (citation and internal quotation marks omitted). This case hinges on the third prong, whether Defendants came "dangerously near" to the completion of murder. *Id.* An act comes "dangerously near" to the completion of the substantive crime when the defendant takes a "direct, but ineffectual, act to accomplish the crime," also known as an "overt act." *Id.* at 914 (citations and internal quotation marks omitted). In other words, the act must reach "far enough toward the accomplishment of the desired result to amount to the commencement of the consummation" of the substantive crime. *Id.* (quoting *Jay v. Commonwealth*, 659 S.E.2d 311, 320 (Va. 2008)).

How "far" is "far enough," however, "is often a difficult [question]," so courts must engage in a highly fact-specific, case-by-case analysis. *Id.* (quoting *Jay*, 659 S.E.2d at 320). Over the years, Virginia's courts have developed two general guiding principles regarding this aspect of an attempted crime. First, an overt act giving rise to criminal liability "need not be the last proximate act[] necessary to the consummation of the crime." *Id.* at 916 (quoting *Jay*, 659 S.E.2d at 320). And second, an act of mere preparation, consisting of "arranging the means necessary for the commission of the crime," cannot serve as the requisite "overt act." *Id.* at 918 (quoting *West v. Commonwealth*, 157 S.E. 538, 539 (Va. 1931)).

The en banc Virginia Court of Appeals in *Jones* addressed Virginia's "overt act" jurisprudence, stating that whenever the Commonwealth proves that a defendant intended to commit a crime, "slight acts done in furtherance of this design will constitute an

53

attempt." *Id.* at 915 (quoting *Lee v. Commonwealth*, 131 S.E. 212, 214 (Va. 1926)). The Attorney General of Virginia had argued in *Jones* that "an overt act is established if the prosecution proves *any* 'slight act' done *in furtherance of a defendant's criminal intent*." *Id.* at 914–15. The court rejected this reading, reasoning that it would turn acts historically viewed as preparatory, like "driving to the location of the crime" or "walking toward the entrance of the location of the robbery with a gun and/or mask in a pocket," into "overt acts." *Id.* at 920. Instead, the court clarified that an overt act *can* be "slight," *id.* at 917, but only if it is one that begins the commission of at least one of the elements of the crime, *id.* at 920. In other words, "preparation ends and attempt begins once an overt act commencing an element of the intended crime is initiated with the requisite intent." *Id.* at 918.

With those principles in mind, we look to guidance from other Virginia case law to determine if the facts here show that Defendants commenced an element of attempted murder regarding either Lanez or Nino. We find highly persuasive the rulings of the Virginia Court of Appeals in *Bottoms v. Commonwealth*, 470 S.E.2d 153 (Va. Ct. App. 1996), and *Rogers v. Commonwealth*, 683 S.E.2d 311 (Va. Ct. App. 2009).

In *Bottoms*, the defendant parked his car on the shoulder of I-95, where a state trooper had pulled over an unrelated third party. 470 S.E.2d at 155. Bottoms then held a loaded and cocked revolver in between the driver and passenger seats, out of the trooper's sight, and made several attempts to "lure [the state trooper] into shooting range, intending to kill him." *Id.* The court upheld Bottoms' attempted murder conviction because his "active conduct" was "aimed at the accomplishment of the crime," and thus "constituted an overt act 'adapted to produce' the commission of murder." *Id.* at 156.

54

In *Rogers*, the defendant and two other men planned an armed robbery of certain occupants at an apartment. 683 S.E.2d at 312. Carrying their weapons, the men walked up to the apartment and rang the doorbell. *Id.* at 312–13. The men knocked two more times on the door, but the occupant, G.V., never opened it. *Id.* at 312. Rogers and his men knew after the third ring that someone was home, but fearing detection, they returned to their car and drove away. *Id.* at 312–13.

Rogers appealed his conviction for attempted robbery and, like Defendants here, argued that it could not stand because "he and his companions merely planned the robbery and went to the scene," none of which were overt acts. *Id.* at 314. The Virginia Court of Appeals disagreed, holding that the actions of obtaining weapons, driving to the apartment, and knocking on the door to gain entry to the apartment "clearly moved beyond the planning stage and into the realm of commencing the robbery and the use of the firearms." *Id.* The court further rejected the notion that G.V.'s refusal to open the door negated the fact that Rogers and his men took an overt act towards the commission of the robbery. "If the victims had opened the door, then [Rogers] and his companions would have committed robbery and used firearms in the commission of that robbery. . . . G.V. simply prevented [Rogers'] conviction for actual robbery and use of a firearm in the commission of an actual robbery." *Id.* at 316.

Applying the principles of these cases to Defendants' actions here,[22] we hold that the evidence was sufficient to show that as to Nino, Defendants took an overt act that "commenc[ed] an element" of murder "with the requisite intent." *Jones*, 826 S.E.2d at 918. Just like in *Rogers*, Mitchell, Foye, Davis, and Lassiter "took [the] preparatory steps" of obtaining firearms and driving to Nino's apartment, "and then actually began following through with their plan." 683 S.E.2d at 315. Specifically, when Mitchell, Foye, and Lassiter "knocked on [Nino's] door with guns in hand, they were taking steps in the commission of a [murder]." *Id.* The evidence, when viewed in the light most favorable to the Government, similarly allows for the reasonable inference that "[i]f [Nino] had opened the door, then [Mitchell, Foye, and Lassiter] would have committed [the murder]." *Id.* at 316. We are also convinced that, like the acts of the defendant in *Bottoms*, the act of knocking on Nino's door was Defendants' chosen means of commencing the murder by drawing Nino out of his apartment to be shot. *See* 470 S.E.2d at 155–56. Though the act of knocking may be "slight," *Jones* instructs that a "slight" act is an "overt" one if it commences an element of the intended offense, 826 S.E.2d at 917–18, and the jury was entitled to make that finding here to establish the attempted murder of Nino.

---

[22] Our reference to "Defendants' actions" necessarily encompasses Simmons. We note that Simmons was not present for any of the actions taken by Mitchell, Foye, Lassiter, and Davis, but is still fully liable for them under Virginia's principles of co-conspirator liability. *See Carter v. Commonwealth*, 348 S.E.2d 265, 267–68 (Va. 1986) ("[T]he law is well settled in Virginia that each co-actor is responsible for the acts of the others, and may not interpose his personal lack of intent as a defense."); *Owens*, 675 S.E.2d at 881.

We reach the opposite conclusion, however, regarding Lanez. Even when reading the evidence in a light most favorable to the Government, we do not see that Defendants commenced an element of murder. Defendants simply drove to a Virginia Beach neighborhood where Mitchell believed Lanez lived. But since the house "looked[] like it was empty," Mitchell did not "want to go up and knock on the door." J.A. 4162. Mitchell only got out of the car to ask some people nearby if they had seen Lanez. They had not, so Defendants left Virginia Beach and headed to Portsmouth to find Blacko. There is no evidence that anyone else exited the vehicle or undertook any other acts regarding Lanez.

Citing the Virginia Supreme Court's decision in *Lee*, 131 S.E. at 215, the Government attempts to frame this as a case in which an "extraneous event," Lanez' absence from his house, thwarted Defendants' completion of the murder. Gov't Cross-Response Br. 44–45. But this case is wholly unlike *Lee*, where the intended victim thwarted the defendant's murder plot by fighting off the defendant and, in the course of that physical altercation, broke the defendant's gun, making it impossible for the murder to occur. 131 S.E. at 214–15. To accept the Government's view that Defendants' unsuccessful efforts here to find their victim's house "commenc[ed] an element" of murder would dissolve the distinction that Virginia courts have drawn between a "preparatory" and "overt" act.

Accordingly, we affirm Defendants' conviction on Count 24 (the VICAR Attempted Murder of Nino), but reverse their convictions as to Count 22 (the VICAR Attempted Murder of Lanez). And because we reverse Defendants' convictions as to Count 22, that leaves only the RICO conspiracy alleged in Count One to support the 18 U.S.C. § 924(c)

offense in Count 23. But since that RICO conspiracy is not categorically a "crime of violence," *see supra* Part III, we must also reverse Defendants' convictions as to Count 23.

2.

Simmons separately challenges the sufficiency of his VICAR convictions stemming from the murders of Tynes and Mercer, and the attempted murders of R.F. and S.M. He first argues that he lacked the requisite intent to murder these individuals. Second, he posits that the evidence insufficiently connected these murders and attempted murders to Nine Trey's purposes. We discern no merit in either claim.

As noted, any VICAR offense requires the Government to prove that the defendant's "general purpose" in committing the substantive violent crime "was to maintain or increase his position in the enterprise." *Zelaya*, 908 F.3d at 927. The Government need not prove a specific "nexus between the act of violence and the racketeering activity." *Fiel*, 35 F.3d at 1005. Instead, "the motive requirement [is] satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.* at 1004 (citation and internal quotation marks omitted). The conduct satisfying the "purpose" element "could occur before [the] commission of a violent crime covered by the statute—for example, if a mafia boss instructed a member to commit murder or else be cast out of the organization," or after, "for example, if the member returned to mafia headquarters to boast about his exploits with a mind toward advancement." *United States v. Umaña*, 750 F.3d 320, 335 (4th Cir. 2014).

First, we find the evidence sufficiently demonstrated Simmons' intent to murder Tynes, and the connection of that shooting to his position in Nine Trey. At that time, Simmons was still under a disciplinary "freeze" from his superior, Dido. Simmons was in direct communication with Foye, the actual shooter, in the moments leading up to Tynes' murder. Foye kept Simmons apprised that he was with Tynes, who Foye referred to as the "meal," or the target of the robbery. J.A. 1888–90, 5956. Just hours after the robbery, at 2:56 a.m., Simmons implored Foye that he needed the money before 11:00 a.m., "or we dead bro." J.A. 5957. And in a post-arrest interview, Simmons admitted that that money was going to be used to repay Dido and get relief from the freeze. Because it is "well settled in Virginia" that both Foye's use of a firearm during a planned robbery and the resulting death are reasonably foreseeable consequences of the robbery, *Carter*, 348 S.E.2d at 267–68, both of Simmons' arguments fail as to Tynes.

The evidence is also sufficient to prove Simmons' connection to the murder of Mercer and attempted murder of R.F. in the early morning hours of December 15, 2015: the same night as the failed robbery plot of a gambling house, when Simmons still needed money to repay Dido. Foye twice asked Simmons about "redrum," or murder, that night. Simmons eventually told Foye at 2:00 a.m. to "[h]andle that before 7:00," which Foye did just twenty minutes later. J.A. 5968–69. Whatever Foye's own alleged personal motivations were, based on Simmons' directive to Foye to "handle" the "redrum" before 7:00, a jury could reasonably infer Simmons' intent to have Mercer and R.F. murdered. That order, Nine Trey's requirement that subordinates follow the orders of their line's superiors, and Simmons' continued need for money to repay Dido, all sufficiently connect

59

the murder and attempted murder to the purposes of Nine Trey. *See Umaña*, 750 F.3d at 335–36.

Finally, the evidence supports the jury's findings of an intent to murder S.M., and that it was in furtherance of Nine Trey's purposes. S.M. was a victim of Simmons' December 27, 2015 directive to "mash the gas" on Skino's men. This internal struggle for power within Nine Trey easily satisfies VICAR's purpose requirement. And there was ample evidence for the jury to conclude that Simmons intended to have anyone murdered who did not wish to fall under his command. Once Simmons' men learned that Blacko would not fall under Simmons' line, the jury was entitled to infer that Simmons intended for the "mash the gas" order to extend to him, too, despite Blacko initially being "vested." Given Nine Trey's tenet that if the target of violence cannot be reached, then the closest person to that target would be harmed, there was also sufficient evidence for the jury to find that the attempted murder of S.M. was a reasonably foreseeable consequence of Simmons' directive. While Simmons claims to have been enraged by S.M.'s shooting, there was video evidence at trial showing him reenacting the shooting and his apparent approval of it. Davis also testified that in his view, Simmons appeared to be more upset about the fact that his name was tied to the shooting than any injury to S.M. We respect the jury's resolution of that evidence. *See Kelly*, 510 F.3d at 440.

In sum, we conclude that the Government produced sufficient evidence for a reasonable jury to conclude that Simmons intended to murder Tynes, Mercer, R.F., and

60

S.M., and that each shooting was committed in furtherance of Simmons' membership in Nine Trey. Thus, we affirm his VICAR convictions on Counts 3, 5, 7, 8, 26, and 27.[23]

3.

Mitchell, largely adopting Simmons' arguments, also asserts that the evidence failed to sufficiently prove that any of the shootings in which he was involved with—the murders of Mercer, Linda, Wayne, and Roberts and the attempted murders of R.F., Nino, and S.M. —were done to further the purposes of Nine Trey.

We find no merit in Mitchell's arguments. In December 2015, Mitchell was motivated to "put in work" and compete with Foye to be just as violent, if not more violent, than Foye in order to improve his chances of gaining rank within Nine Trey. The jury could properly connect this motive to each of his murders and attempted murders. Regarding the murders of Linda and Wayne, the jury was further entitled to conclude that his participation was expected of him based on his membership in Nine Trey, because Nine Trey's tenets called for "snitches," or the closest person that could be reached, to be killed. *See Zelaya*, 908 F.3d at 927. Additionally, Mitchell's bragging to Foye and Brehon about his senseless killing of Roberts for walking on his side of the street also connects that murder to his membership in Nine Trey. *See Umaña*, 750 F.3d at 335–36. Thus, we do not hesitate to affirm Mitchell's VICAR convictions on Counts 5, 7, 8, 10, 11, 23, 26, and 27.

---

[23] Simmons also challenges the sufficiency of the evidence supporting two of his § 924(c) convictions in Counts 34 and 36, which stem from his possession of a firearm during his drug trafficking conduct. Having reviewed the record, we summarily reject these claims.

4.

Next, Lassiter argues that there was insufficient evidence to support his conviction on Count One, the RICO conspiracy offense, because there was no evidence to show that he became a Nine Trey member. Lassiter's argument is foreclosed by our recent ruling in *United States v. Cornell*, 780 F.3d 616 (4th Cir. 2015).

Wearing Nine Trey's colors at Simmons' house, Lassiter "was present at the meeting[] planning" the attempted murders of Nino and S.M., and "directly participated" in those racketeering acts. *Id.* at 630–31. "From these facts, the jury could infer that [Lassiter] understood the [murders] to constitute [gang] activities, and that by joining in them, he agreed to advance the enterprise. Under our precedent, nothing more is required." *Id.* (citations omitted). Indeed, we emphasized in *Cornell* that "[o]utsiders who help the enterprise accomplish its illicit goals, thereby evidencing their agreement to advance the cause, are fully liable under § 1962(d)." *Id.* at 631. That is precisely Lassiter's involvement with Nine Trey here. Thus, we affirm Lassiter's conviction on Count One.

V.

For the foregoing reasons, in the Government's lead appeal, we affirm the district court's holding that a RICO conspiracy, "aggravated" or not, is not categorically a crime of violence. As to Defendants' cross-appeal, we hold that the district court's jury instructions constructively amended the VICAR Assault Counts, and that there was insufficient evidence supporting their convictions for the VICAR attempted murder of Lanez and the related § 924(c) count. Accordingly, we reverse Defendants' convictions on

62

Counts 8, 15, 18, 22, 23, 27, and 29, vacate their respective sentences, and remand for further proceedings consistent with this opinion. In all other aspects, however, we affirm.

*Nos. 18-4875, 18-4876, & 18-4877:*
*AFFIRMED*

*Nos. 19-4269, 19-4287, & 19-4345:*
*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*

RICHARDSON, Circuit Judge, concurring in part and concurring in the judgment:

I happily join my good colleague's opinion in all but its analysis finding the charged racketeering conspiracy was not a crime of violence (Part III). I agree with that conclusion but take a different path.

Simmons and Mitchell were charged and convicted of possessing a firearm in furtherance of a "crime of violence." 18 U.S.C. § 924(c). The crime-of-violence predicate was the charged racketeering conspiracy. To qualify as a "crime of violence," that conspiracy must satisfy the "force clause," meaning that it must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A); *cf. United States v. Davis*, 139 S. Ct. 2319, 2336 (2019) (finding § 924(c)(3)'s residual clause unconstitutionally vague).

We apply the "categorical approach" to determine whether an offense satisfies the "force clause" when the offense statute defines a single crime with an indivisible set of elements. *United States v. Mathis*, 932 F.3d 242, 264, 267 (4th Cir. 2019). Under that approach, we ask "whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc). But if the statute is divisible into "multiple, alternative versions of the crime" with potential offense elements listed in the alternative, we use a "modified" categorical approach. *Descamps v. United States*, 570 U.S. 254, 262–63 (2013). The modified-categorical approach permits looking beyond the statute to certain documents to see which of the alternative elements formed the basis of the conviction. *United States v. Bryant*, 949 F.3d 168, 173 (4th Cir. 2020). If those documents identify the

64

crime of conviction from the alternatives, we consider whether it categorically satisfies the force clause. *Id.*

Under either approach, generic conspiracies face a significant hurdle to being classified as a "crime of violence" under the force clause. *See Simms*, 914 F.3d at 233–34. For a conspiracy is an "inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). And an agreement alone does not require "the actual, attempted, or threatened use of physical force." *Simms*, 914 F.3d at 233–34.

A racketeering conspiracy requires proof of an agreement to commit a substantive racketeering offense, one of which is conducting an enterprise through a pattern of racketeering activity. *United States v. Mouzone*, 687 F.3d 207, 217–18 (4th Cir. 2012); 18 U.S.C. § 1962(c), (d). The object of the agreement is the commission of a pattern of racketeering activity. But, like other conspiracies, a conviction does not require that the co-conspirators take *any* action in furtherance of their agreement, much less commit any of the identified racketeering activities. *Salinas v. United States*, 522 U.S. 52, 63 (1997). It is the agreement to engage in racketeering activity that forms the basis of the racketeering conspiracy.

But here, the indictment charged that the racketeering conspiracy involved five actual murders under Virginia state law. And the jury found that those murders were committed as part of the racketeering conspiracy. In Virginia, those murders are punishable by a maximum term of life in prison. *See* Va. Code Ann. § 18.2-10 (1998); *id.* § 18.2-32 (2017). Under the racketeering statute, establishing that the racketeering

65

conspiracy was "based on" at least one of the murders—as an offense punishable by life in prison—increases the maximum sentence from 20 years to life imprisonment. 18 U.S.C. § 1963(a).

This "aggravated" racketeering conspiracy based on the charged murders, the government argues, is categorically a crime of violence. Under Virginia law, first-degree murder necessarily involves the actual, attempted, or threatened use of physical force. *Mathis*, 932 F.3d at 265 (holding that first-degree murder under Virginia law, Va. Code Ann. § 18.2-32, is a crime of violence under the force clause). So, in the government's view, this aggravated racketeering conspiracy—that is, one based on murder—is an alternative crime that constitutes a crime of violence.

I agree that the racketeering-activity murders that increase the statutory-maximum punishment are "elements" of the charged racketeering conspiracy. The Supreme Court has made clear that "[i]f statutory alternatives carry different punishments, then under *Apprendi* they must be elements." *Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016) (citations omitted). In that vein, in *Burrage v. United States*, the Court held that a "death results" enhancement that increased a defendant's minimum and maximum sentence was "an element that must be submitted to the jury and found beyond a reasonable doubt." 571 U.S. 204, 210 (2014) (citing *Alleyne v. United States*, 570 U.S. 99, 115–16 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). And the "elements" of a criminal offense required to be submitted to the jury under *Alleyne* and *Apprendi* are the same as the "elements" used to determine whether we employ a modified-categorical approach in a crime-of-violence inquiry. *See United States v. Runyon*, 994 F.3d 192, *202 (4th Cir.

66

2021); *see also United States v. Tsarnaev*, 968 F.3d 24, 105 (1st Cir. 2020), *petition for cert. granted on other grounds*, No. 20-443 (U.S. Mar. 22, 2021). So the racketeering statute is divisible into at least two offenses: (1) a racketeering conspiracy that is *not* "based on a racketeering activity for which the maximum penalty includes life imprisonment" and (2) a racketeering conspiracy that *is* "based on a racketeering activity for which the maximum penalty includes life imprisonment." § 1963(a).

Given that our precedent dictates that the racketeering statute is divisible, we must determine which of the two alternative crimes it includes was the crime of conviction. To do so, we may "consult[] the trial record[,] including charging documents . . . and verdict forms." *Johnson v. United States*, 559 U.S. 133, 144 (2010). Those documents tell us that the "crime of violence" on which Simmons and Mitchell's § 924(c) convictions were predicated was a racketeering conspiracy that was in turn "based on a racketeering activity for which the maximum penalty includes life imprisonment" (murder). § 1963(a). The jury's special verdict forms thus make clear that they were convicted of the aggravated conspiracy. And those jury findings allowed the judge to sentence Simmons and Mitchell to life imprisonment on the racketeering-conspiracy charge.

So does an aggravated racketeering conspiracy qualify, categorically, as a "crime of violence"? It does not.

First, it is of no consequence that the jury found the murders, instead of only an agreement to commit the murders, occurred. For once we identify the crime of conviction, in this case an aggravated racketeering conspiracy, we look only to the crime's elements to

67

determine whether it satisfies the force clause. *See Bryant*, 949 F.3d at 173. The facts of the case and the specific allegations and jury findings are irrelevant.

Second, the aggravating element—that the conspiracy is "based on" a life-sentence-eligible racketeering activity—does not necessarily require "the actual, attempted, or threatened use of physical force." *Simms*, 914 F.3d at 233–34. The essence of a conspiracy is the agreement, not the completion of the agreed-upon offense. And that agreement is criminal when its object—what it is based on—is a pattern of racketeering activity. So a racketeering conspiracy is "based on" the charged racketeering activities regardless whether those racketeering activities are eventually completed. *See Salinas*, 522 U.S. at 63; *see also United States v. Fernandez*, 388 F.3d 1199, 1259 (9th Cir. 2004). It is enough that the agreement contemplated the eventual occurrence of the charged racketeering activities, even if they do not ultimately take place. Nothing in § 1963(a)'s enhancement changes the Supreme Court's directive that the object of a racketeering conspiracy need not be completed. *See Salinas*, 522 U.S. at 63.[*]

---

[*] The government must prove that the agreed-to racketeering activity was subject to a life sentence *if completed*. So an allegation that the object of the agreement was somehow limited to "attempted murder" instead of an agreement to commit murder would not subject the Defendants to the increased statutory maximum. Nor would it be enough for the government to allege that the racketeering activity agreed to was circularly limited to a "conspiracy to commit murder." *See United States v. Warneke*, 310 F.3d 542, 549–50 (7th Cir. 2002). But where the charged object of the conspiracy was first-degree murder, then the conspiracy is "based on" first-degree murder, which carries a life sentence under state law, and the increased statutory penalty would apply even if the murder was not completed.

Certainly, the increased maximum penalty would apply if the defendants committed the charged murders as part of their agreement. But it would also apply if the defendants had merely *agreed* to commit the murders, without later carrying out that agreement by killing someone. As an aggravated racketeering conspiracy may be committed by merely *agreeing* to commit murder, it does not categorically satisfy the force clause because such an agreement "does not invariably require the actual, attempted, or threatened use of physical force." *Simms*, 914 F.3d at 233–34. So even an "aggravated" racketeering conspiracy is not a crime of violence under the force clause.

The cases the Government identifies—*Runyon*, 994 F.3d 192, *Tsarnaev*, 968 F.3d 24, and *In re Hall*, 979 F.3d 339 (5th Cir. 2020)—do not advise a different result. In those cases, the increased statutory penalty applied when "death results," which necessarily requires completing the charged offense. *Runyon*, 994 F.3d at *203 (An "act that results in death obviously requires 'physical force.' And the death resulting from a conspiracy to commit murder for hire has the 'requisite mens rea' to constitute a use of physical force." (citations and emphasis omitted)); *see also Tsarnaev*, 968 F.3d at 104; *In re Hall*, 979 F.3d at 344. But the increased statutory maximum for a racketeering conspiracy applies when it is "based on" charged racketeering activity whether or not it is completed.

For these reasons, I would affirm the district court's decision to vacate Simmons and Mitchell's convictions on the § 924(c) charge in Count 30. Accordingly, I concur in the judgment on that issue while fully joining the rest of the Court's opinion.

69